**BERTUCCI CONTRACTING CORPORATION**

v.

**M/V ANTWERPEN, Her Engines, Boilers, Tackle, and Equipment in Rem, et al.**

**Nos. CIV.A. 03–0186, CIV.A. 03–0277, CIV.A. 03–0291.**

United States District Court, E.D. Louisiana.

Aug. 10, 2004.

The court discusses the claim for the sake of completeness.

Randolph J. Waits, Louis G. Spencer, Matthew F. Popp, Emmett, Cobb, Waits & Kessenich, New Orleans, LA, for Bertucci Contracting Corporation, plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEMMON, District Judge.

## I. BACKGROUND

On January 19, 2003, at 0200 hours, the M/V LADY JEANETTE,[1] owned by Sandbar III, Inc. (Sandbar) and operated by F & L Marine Management, Inc. (F & L), the bareboat charterer, and her flotilla of four hopper barges in a two-by-two configuration were headed downbound on the Mississippi River. The M/V LADY JEANETTE was above the Huey P. Long Bridge when Captain Kenneth Ayars established radio communications to discuss the traffic situation with a number of vessels in the vicinity of Nine Mile Point. The M/V BEVERLY ANDERSON, a large seagoing integrated tug and barge, was proceeding downbound; and the M/V ALICE HOOKER and the M/V ANTWERPEN, an oceangoing bulk freighter,[2]

---

1. The M/V LADY JEANETTE is an 800 horse-power twin-screw towboat, 50.5 feet long and 20 feet wide, which had four loaded barges, two by two.

2. The M/V/ ANTWERPEN is 600' long, 90'

owned and operated by Marvita Shipping Co., Ltd. (Marvita), were proceeding upbound.

Teal M. Grue, a compulsory New Orleans/Baton Rouge river pilot (NOBRA 64), who was assisting the Polish crew of the M/V ANTWERPEN, agreed to overtake the M/V ALICE HOOKER on the M/V ALICE HOOKER'S starboard side, before meeting the M/V BEVERLY ANDERSON. The M/V BEVERLY ANDERSON was to pass the M/V LADY JEANETTE on the M/V BEVERLY ANDERSON's starboard side (two whistles), then pass the M/V ANTWERPEN on the starboard side. Grue and Captain Ayars of the M/V LADY JEANETTE agreed to a port-to-port passing (one whistle) and for the M/V LADY JEANETTE to navigate close to the right descending bank near Nine Mile Point.[3] Although all passings were successful, Grue was unable to avoid an allision with a stationary fleet of barges, owned and operated by Bertucci Contracting, located on the left descending bank at Mile 103.5 AHP above Nine Mile Point, after he passed the M/V LADY JEANETTE. Marvita alleges that the M/V LADY JEANETTE failed to comply with the passing agreement and embarrassed the M/V ANTWERPEN's navigation, forcing it into the Bertucci fleet.

Bertucci filed a complaint against the M/V ANTWERPEN *in rem* and Marvita *in personam* for damages to its barges (No. 03–0186), and Marvita filed a third-party complaint against the M/V LADY JEANETTE, F & L, and Sandbar. The case between Bertucci and Marvita was settled prior to trial, but Marvita's third-party claims remain outstanding. Marvita filed a separate complaint against the M/V LADY JEANETTE *in rem* and F & L and Sandbar *in personam* (No. 03–0277) asserting an admiralty and maritime claim under Rule 9(h) of the Federal Rules of Civil Procedure; and F & L and Sandbar filed a complaint for exoneration from or limitation of liability to the value of the M/V LADY JEANETTE (No. 03–0291). On March 29, 2004, the consolidated cases proceeded to trial before the court on the issue of fault, liability, and limitation of liability.

## II. DISCUSSION

Marvita alleges that the M/V LADY JEANETTE failed to keep her passing agreement to hold close to the right descending bank (west bank) as it proceeded around Nine Mile Point, encroached on the path of the M/V ANTWERPEN, and caused the pilot to steer into the left descending bank (east bank) and thus into the Bertucci barges, in an emergency action to avoid collision with the M/V LADY JEANETTE. Marvita contends that the M/V LADY JEANETTE was negligent in failing to exercise prudent seamanship and to follow the Inland Navigation Rules, 33 U.S.C. § 2001 *et seq.*, and that the failure to comply was a proximate cause of the allision with the Bertucci barges. Specifically, Marvita argues that the agreement to pass port-to-port required the M/V LADY JEANETTE to alter her course to starboard in order to pass port-to-port

---

3. "Vessels navigating the Mississippi River must adhere to the Narrow Channel Rules (Rules 9 and 14 [of the Inland Navigational Rules, 33 U.S.C. §§ 2001–2038]) unless otherwise agreed." *Burma Navigation Corp. v. Reliant Seahorse MV,* 99 F.3d 652, 658 (5th Cir.1996). Rule 9(a) (§ 2009) provides that a wide.

vessel proceeding downbound with a following current shall have the right-of-way over an upbound vessel and shall propose the manner and place of passage. "The vessel proceeding upbound against the current shall hold as necessary to permit safe passing." Because of the passing agreement, the vessels were not required to adhere to these rules, unless an emergency situation arose.

(Rule 14); the M/V LADY JEANETTE, as a vessel proceeding along a narrow channel, was required to keep her tow close to the right descending bank (Rule 9); the operator of the M/V LADY JEANETTE failed to use all available means to determine if a risk of collision existed by failing to use the vessel's radar (Rule 7); the Captain did not comply with the precautions required of seamen or give due regard to the dangers of navigation and collision (Rule 2); the M/V LADY JEANETTE did not take early and substantial action to maneuver to her right to keep clear of the M/V ANTWERPEN (Rules 8 and 14); the M/V LADY JEANETTE failed to maintain a proper lookout (Rule 5); and Captain Ayars failed to warn Grue that he was unable to comply with the passing agreement (Rule 34). Marvita contends that the violations of the Inland Rules raise a presumption of fault against the M/V LADY JEANETTE. The M/V LADY JEANETTE defendants argue that the M/V LADY JEANETTE did not embarrass the navigation of the M/V ANTWERPEN and that the allision was caused by the M/V ANTWERPEN's failure to maintain proper steerageway.

■ Under the general maritime law, a party's negligence is actionable only if it is a 'legal cause' of the plaintiff's damages. *See Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 649 (5th Cir. 1992). "The plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury." In re *Cooper T. Smith*, 929 F.2d 1073, 1077 (5th Cir.1991).

At trial, Grue stated that he reached a passing agreement with the M/V LADY JEANETTE after discussing with Captain Ayars whether he thought he "could maneuver in a certain way ... before committing to a one whistle passing," specifically "Can you stick to the point and I'll come up the bend?" According to Grue, Captain Ayars answered something to the effect that it would be no problem.

Grue testified that, as he approached the M/V BEVERLY ANDERSON, he began slowing down, first to half bell and then to slow bell, and successfully executed the passing. Shortly after the passing, he saw the M/V LADY JEANETTE rounding the point. Grue testified that, when he first saw the M/V LADY JEANETTE, her angle in the river "didn't seem correct." However, he was not concerned because "it was a little bit early in his initial turn." Grue contacted Ayars a second time to inquire whether everything was alright, and Ayars assured him everything was fine. In a third communication, Grue informed Ayers "it's not looking good." Grue did not communicate to Captain Ayars or any other vessel that he thought they were going to collide, nor did he sound the danger signal.

Grue testified that, because he observed that the M/V LADY JEANETTE "was closer to the left descending bank than the right descending bank", he went to "dead slow bell" and pulled his bow and then his stern away from the M/V LADY JEANETTE. Grue stated that he asked Captain Ayars "to go ahead and lay flat, if he could, because then—if he laid flat along the side of my ship, it's not near as damaging or less likely for his boat to actually flip over." Grue testified that the M/V LADY JEANETTE was able to clear the M/V ANTWERPEN after he pulled the stern away from her. As soon as the M/V LADY JEANETTE passed, Grue went to full astern in order to pull the stern back in line. Grue described his movement as having to "seesaw" around the M/V LADY JEANETTE. After he cleared the M/V LADY JEANETTE, Grue realized he was in danger of an imminent allision with the

barges. He went full astern and sounded a danger signal just before he hit the barges.

Captain Ayars testified that he was familiar with the bend in the river at Nine Mile Point because he had traveled that stretch as often as two or three times a day for several years. He stated that his position at the time of the passing was about 400 feet from the right descending bank, "give or take 100 feet"; the M/V ANTWERPEN was about 600 or 700 feet off the right descending bank; and the vessels were about 200 feet apart when they passed, "give or take 50 feet." Captain Ayars testified that he had agreed to hold the point; however, when he established visual contact with the M/V ANTWERPEN and saw her position, he started heading towards the left descending bank behind the M/V ANTWERPEN's stern. Ayars stated that when Grue had turned his stern, "everything opened up,"[4] and he "had the whole river to go." Captain Ayars testified:

> There was no risk of collision in my mind whatsoever, because his range lights were opening all the time. I was coming around and he was open, and I was seeing his red.[5] I was looking on my radar. I wasn't sliding off at the point hardly any at all. And, when I come around and looked at it, it was good to go.

The Captain stated that he was "in the pocket" (that the head of his tow was past the bow of the M/V ANTWERPEN) and that the M/V ANTWERPEN could not have hit the M/V LADY JEANETTE "if she tried." Captain Ayars testified that Grue should have steered the M/V ANTWERPEN directly at the M/V LADY JEANETTE, and he did not understand why Grue did not. Instead, the M/V ANTWERPEN was swinging away, and Captain Ayars stated that "it looked like the river had caught him." Only after the M/V LADY JEANETTE passed the M/V ANTWERPEN, did Captain Ayars hear the danger signal.

The transcript of the United States Coast Guard VTS computer and the deck logs for the two vessels support Captain Ayars' testimony. Captain Ayars initially informed the M/V ANTWERPEN that she was "pretty tight up on here so I think we'll be alright Bud." At 0226:25 hours, the Captain said "I'm all right we're just coming around there Buddy you got plenty of room." At 0227 Grue stated "I don't think it's gonna work," to which Captain Ayars responded "looking good to me Bubba . . . 64." A little after 0229, the M/V ALICE HOOKER asked Grue if he was "OK," and Grue answered "negatory, negatory."

The deck log for the M/V ANTWERPEN indicates that the M/V ANTWERPEN hit the Bertucci barges on the starboard side at 0230, but there is no entry indicating that the M/V ANTWERPEN was embarrassed or that there was a problem with the passing with the M/V LADY JEANETTE. Further, there is no notation in the log of the M/V LADY JEANETTE that there was any incident with the M/V ANTWERPEN.

The court finds credible the testimony of Captain Larry Strouse, the expert witness for the M/V LADY JEANETTE defendants. Captain Strouse testified that the M/V ANTWERPEN's passing agreements with the M/V BEVERLY ANDERSON and the M/V LADY JEANETTE were "like threading a needle" because Grue had to put "a large ship in a small space

---

4. "[E]verything opened up. I had the whole river to go." Tr. transcript, Vol. 3, 32.

5. The range light (after and higher) and masthead light are white. The red light is the port side light, and a green light is the starboard side light.

between two other vessels southbound." Captain Strouse opined that Grue made a critical mistake when he slowed down after he met the M/V BEVERLY ANDERSON because "when you slow down and you're going into Nine Mile Point, the current's going to come down and hit you broadside on the head, and push you toward the east bank, so you want to stay away from that as much as possible."[6] Captain Strouse explained that there is a strong current coming around closer to the left descending bank of the river, and "if you don't maintain your speed enough to buck the current and to maintain steerageway, that current will take your head and just push it right ... towards the eastbank, or the left descending bank." When asked for his opinion why the M/V ANTWERPEN allided with the Bertucci fleet, Captain Strouse stated:

> Because of the current pushing them. Well, because of the slow speed, because they did not try to drive out of it, or if they did try to drive out of it, it was too late. And with that current coming down at slow speed, you have no response from your rudder and you've got a deeply laden ship, that current is going to take it right in towards the eastbank.

Captain Strouse stated that, even if Grue turned his rudder and tried to drive out of the current and get more control of his ship, it would not have any effect because he did not increase the speed. He added:

> When he went to dead slow, he broke his headway and then he probably, what we call kicking it ahead, he increased the speed on the ship and tried to kick it out of there, but his-the current was

hitting him so hard at that time, that it was ineffective, due to the fact that the-he did not have headway on the ship.

> He could have-if he would have had headway on the ship, and come ahead strong on the ANTWERPEN at that time, he possibly could have drove it out of there.

In support of its allegations, Marvita presents the testimony of Louis Frank, the Captain of the M/V ALICE HOOKER. Grue contacted Captain Frank and arranged to overtake the M/V ALICE HOOKER on her starboard side. After passing the M/V ALICE HOOKER, the M/V ANTWERPEN was "less than midriver" and "favoring the right descending shore." Because there was heavy traffic in the area, Captain Frank decided to stop above the Continental Grain dock down river from Nine Mile Point and let the traffic pass before he proceeded. Captain Frank testified that, on the radar, he observed the M/V ANTWERPEN and the M/V BEVERLY ANDERSON pass starboard to starboard. He also heard the radio communication between the M/V ANTWERPEN and the M/V LADY JEANETTE, but could not see the M/V LADY JEANETTE until she came around the point within range of his radar. He testified that, as the M/V LADY JEANETTE rounded the point, she was past the middle of the river with the tow pointing toward the bend. Frank advised Grue by radio: "Ya Ya 64 I don't know its shaky here now." As the M/V ANTWERPEN approached the M/V LADY JEANETTE, Captain Frank testified that the vessels passed too close to one another and that

---

**6.** The engine room log indicates that the engine was at slow ahead from 0222 to 0223; half ahead from 0223 to 0225, full ahead from 0225 to 0227, at half ahead at 0227, to stop at 0229, to full astern at 0230, and to stop at 0231. Joint exh. 5. Grue testified that he spent the four minutes from 0223 to 0227

dealing with passing the M/V LADY JEANETTE and then turned his attention to preparation for the allision. Contrary to Grue's testimony, the engine log indicates that he went to full astern at 0230, the approximate time of impact with the barges.

the passing was successful only because Grue did a "beautiful job" maneuvering the ship.

However, the court does not find reliable Captain Frank's testimony regarding the size and distance between the vessels as seen on the radar. When Captain Frank was first interviewed, he stated that it appeared on the radar screen that the M/V LADY JEANETTE was pushing nine or twelve barges, when in fact the M/V LADY JEANETTE was pushing four barges. Further, the testimony of Marvita's expert witness, Captain Douglas Torborg, concerning the reading of reflected images on a radar screen calls into question the accuracy of Captain Frank's perception of the incident.[7]

The evidence establishes that the M/V LADY JEANETTE did not embarrass the navigation of the M/V ANTWERPEN, and that the cause of the allision was the M/V ANTWERPEN's failure to maintain proper steerageway. The court finds that, in view of the passing agreement, Rule 9 (Narrow Channel Rule) and Rule 14 (Head-on situation) do not apply. If there had not been a passing agreement, the Rules would have required Grue to stop below Nine Mile Point until Ayars safely passed through the bend. *See Weathers Towing, Inc. v. M/V Herman Pott*, 570 F.2d 1294, 1295 (5th Cir.1978).

There was, however, an agreement, and Captain Ayars complied with the agreement. No emergency arose which would have changed the passing agreement. The court accepts Captain Ayars testimony that he initially held the right descending (west) bank and that he did not move toward the middle of the river until he made visual contact with the M/V ANTWERPEN and saw he had the opportunity to maneuver further from the bank behind the M/V ANTWERPEN's stern and prepare for the agreed passage of the M/V BAYOU BLACK.[8] This finding is supported by the VTS computer transcript which shows that Captain Ayars initially told Grue that she was "pretty tight up on here so I think we'll be alright Bud."

The court further finds that there was no violation of Rule 2 (Responsibility), Rule 5 (Look-out), Rule 7 (Risk of collision), and Rule 8 (Action to avoid collision) because Captain Ayars used the appropriate means under the circumstances and conditions to appraise the situation. *See Parker Bros. & Co. v. De Forest*, 221 F.2d 377, 380 (5th Cir.1955) (a separate and independent lookout is not required under the rule, and the question of whether one is needed is one of fact to be resolved under all of the circumstances). Captain Ayars intermittently checked his radar and the position of the M/V ANTWER-

---

7. Marvita also offers the testimony of Jules Cote, whose home is located on the Mississippi River, down river from Nine Mile Point and a quarter of a mile from the Bertucci fleet. Cote was awakened by the sound of the M/V ANTWERPEN blowing an emergency whistle and ran to the window. The M/V LADY JEANETTE was directly in front of Cote's house continuing downstream very close to the shoreline, and the M/V ANTWERPEN was blowing its whistle and heading upstream toward the shoreline where the Bertucci fleet was located. Approximately two minutes passed between the time Cote heard the whistle and the impact of the M/V ANTWERPEN's allision with the Bertucci fleet of

barges. However, Cote did not see the actual meeting of the vessels, and Cote was unable to testify about the vessels' positions at passing.

8. Captain Ayars arranged to have the M/V BAYOU BLACK, which was behind him, pass him on the M/V BAYOU BLACK's port side (one whistle side or M/V LADY JEANETTE'S west bank side) before he rounded up (approximately 180 degree turn) and went into the Westwego elevator to deliver the barges. He testified that the M/V ANTWERPEN's position in the river allowed him to move over sooner so that the M/V BAYOU BLACK could pass.

PEN's lights, and he had visual contact with the M/V ANTWERPEN under clear weather conditions as he rounded the point. Moreover, the contemporaneous evidence does not support a finding of a risk of collision or embarrassment of navigation: there is no radio communication in which Grue gives any indication that he needed more room or that he thought the M/V ANTWERPEN or the M/V LADY JEANETTE were at imminent risk of collision; there is no entry in the deck log for the M/V ANTWERPEN on January 19, 2003, concerning the passing with the M/V LADY JEANETTE or any embarrassment of the M/V ANTWERPEN; and Grue did not sound the danger signal until just before alliding with the Bertucci fleet.

Captain Ayars did not violate Rule 34 (Maneuvering and warning signals) by failing to sound a whistle because he reached an agreement with Grue and did not perceive any risk or danger in complying with the agreement. The fact that Grue did not sound the danger signal is consistent with Captain Ayars' testimony that there was no danger.

The court finds that the M/V LADY JEANETTE complied with the passing agreement and the applicable rules for inland navigation, and that Marvita has not established that the M/V LADY JEANETTE was negligent. Because Marvita has not established negligence, F & L and Sandbar F & L are exonerated from liability for Marvita's third-party claims in No. 03–0186 and the *in rem* and *in personam* claims in No. 03–0277.